UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

APPROXIMATELY FIVE HUNDRED FORTY-ONE THOUSAND NINE HUNDRED FIFTY-THREE DOLLARS AND ZERO CENTS ($541,953.00) SEIZED FROM JP MORGAN CHASE NA ACCOUNT NUMBER 928805297 HELD IN THE NAME OF JIAWIG TRADE INC.,

                    Defendant.

**MEMORANDUM & ORDER**
23-CV-9585 (MKB) (PK)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

    Plaintiff United States of America ("Government") commenced the above-captioned civil forfeiture action *in rem* against approximately $541,953 held in account number 928805297 at J.P. Morgan Chase Bank NA in the name of Jiawig Trade Inc. ("Jiawig Account") and all traceable proceeds in the account ("Defendant Funds"). (Compl., Docket Entry No. 1.) The Government seeks to have the Defendant Funds forfeited and condemned to the use of the United States as property involved in, or traceable to property involved in, money laundering and as property constituting or derived from proceeds traceable to a wire fraud scheme pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).[1] (*Id.* ¶ 1.) On February 22, 2024, the Government filed an

---

[1] Section 981(a)(1)(A) provides for the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title, or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A). The Government alleges that the Defendant Funds are property traceable to the laundering of monetary instruments in violation of section 1956(a)(1)(B)(i) or conspiracy to commit such an offense in violation of 1956(h). (*See* Compl. ¶¶ 1, 8.) Section 981(a)(1)(C) provides for the

Amended Complaint that added factual allegations and requested the Court order (1) a warrant for arrest of the Defendant Funds; (2) notice of the proceedings be given to all interested persons; (3) forfeiture of the Defendant Funds and condemn them to the Government's use; and (4) award of costs, disbursements, and other further relief the Court deems just and proper.[2]  (Am. Compl., Docket Entry No. 5.)

On August 12, 2024, the Clerk of Court entered default.  (Clerk's Entry of Default, Docket Entry No. 11.)  On August 14, 2024, the Government moved for default judgment and decree of forfeiture and order for delivery.  (Gov't's Mot. for Default J. ("Gov't's Mot."), Docket Entry No. 12; Gov't's Mem. in Supp. of Gov't's Mot. ("Gov't's Mem."), Docket Entry No. 17.)  On August 15, 2024, the Court referred the Government's motion to Judge Kuo for a report and recommendation.  (Order dated Aug. 15, 2024.)  By report and recommendation dated February 10, 2025, Judge Kuo recommended that the Court grant the Government's motion for default judgment and order that the Defendant Funds be forfeited and condemned to the use and benefit of the Government, and that the United States Secret Service ("USSS"), and its respective agents or contractors, shall dispose of the Defendant Funds in accordance with all applicable laws and regulations (the "R&R").  (R&R, Docket Entry No. 18.)

---

forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of," *inter alia*, "specified unlawful activity" or a conspiracy to commit such offense."  18 U.S.C. § 981(a)(1)(C).  The Government alleges that the proceeds of the property is traceable to the unlawful activity of wire fraud in violation of 18 U.S.C. § 1343. (Compl. ¶ 1.)

[2]  On February 26, 2024, Magistrate Judge Peggy Kuo issued a warrant for arrest of articles *in rem*.  (Order for Warrant, Docket Entry No. 6.)  On August 7, 2024, the Government certified that it posted a notice of forfeiture on an official government website for at least thirty consecutive days and served notice of the *in rem* action on the two potential known claimants, Jiawig Trade Inc. and MiaoMiao Zhang.  (Decl. of Publication, Docket Entry No. 7; Certificate of Service, Docket Entry No. 8.)  No person appeared, filed claims, or otherwise responded or moved with respect to the notice of forfeiture or Amended Complaint.

No party has objected to the R&R and the time for doing so has passed.

**I.  Background**

In April of 2023, the USSS uncovered multiple victims of an investment fraud scheme within the United States, including within the Eastern District of New York (the "Investment Fraud Scheme").[3]  (Am. Compl. ¶ 29.)  The Investment Fraud Scheme utilized "fraudulent investment and/or cryptocurrency trading applications" ("Fraudulent Investment Platforms") designed to convince users that they are "popular investment and/or cryptocurrency trading platforms into which their cryptocurrency or fiat currency[4] can be deposited."  (*Id.* ¶ 27.)  Victims of the scheme sent money to various Fraudulent Investment Platforms and websites purporting to be legitimate cryptocurrency exchanges and/or investment platforms and were also convinced to wire fiat currency to various fraudulent companies on the belief that they were investing in gold and/or cryptocurrency.  (*Id.* ¶ 29.)

The Jiawig Account was opened on or about February 23, 2023, and the sole signatory on the account was MiaoMiao Zhang.  (*Id.* ¶¶ 38–39.)  Jiawig Trade Inc., the business entity associated with the Jiawig Account, is registered to "Farscar Cap Ltd," has a registration address of 90 State Street, Suite 700, Albany, New York, and MiaoMiao Zhang was registered as the filer on January 19, 2023.  (*Id.* ¶ 42.)  Law enforcement agents learned that Jiawig Trade Inc.

---

[3]  The Court assumes the truth of the factual allegations in the Amended Complaint for the purpose of deciding the Government's motion.

[4]  *See Donovan v. GMO-Z.com Tr. Co., Inc.*, No. 23-CV-8431, 2025 WL 522503, at *1 (S.D.N.Y. Feb. 17, 2025) (describing "fiat" currencies as an alternate term for government-issued currencies); *Nero v. Uphold HQ Inc.*, 688 F. Supp. 3d 134, 141 (S.D.N.Y. 2023) (defining fiat currencies as "government-backed money such as the U.S. Dollar and British Pound"); *see also Secs. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 317 (S.D.N.Y. 2023) (listing U.S. dollars and Mexican pesos as examples of fiat currencies), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023).

3

purportedly "sells durable goods such as brushes, storage boxes, hair stickers," did not maintain a visible online presence or advertising, and its registered address is listed as a "virtual office space where individuals can use to receive mail, register companies, and for marketing purposes." (*Id.* ¶¶ 42–43.)

Between March and April of 2023, there were roughly fifty-three incoming wire transfers into the Jiawig Account, totaling approximately $3,497,958, and approximately twenty-five outgoing Automated Clearing House (ACH) payments from the Jiawig Account, totaling approximately $3,419,900. (*Id.* ¶¶ 40–41.) Jiawig Trade Inc. has been named in at least five complaints filed on the Internet Crime Complaint Center website (IC3.gov) from victims reporting that they sent funds related to "socially engineered wire fraud schemes" and the account has been reported to law enforcement as having been used in other fraudulent schemes. (*Id.* ¶¶ 37, 44.)

    a. **Four victims transferred or attempted to transfer funds to the Jiawig Account**

On or about April 20, 2023, an individual residing in Hawaii ("Victim") reported that he was the victim of investment fraud and on or about June 7, 2023, during an interview with law enforcement, Victim disclosed that he received a text from an unknown woman who identified herself as Qiu Jiaxin ("UF-1") and claimed to live in Singapore. (*Id.* ¶¶ 30–31, 31a.) Between January 27, 2023, and March 31, 2023, at the direction of UF-1 and the Fraudulent Investment Platform, Victim transferred from his TD Ameritrade bank account ending in 9441 and his First Hawaiian bank account ending in 2449 approximately $1,525,000 to various bank accounts, including approximately $200,000 that he transferred to the Jiawig Account. (*Id.* ¶¶ 31c, 31j, 35.) On or about April 12, 2023, Victim attempted to withdraw his earned profits but purported customer service representatives denied the withdrawal, stating that he needed to pay "5% tax to

4

UK Tax Agency due by May 5 2023" and that "he would owe an extra 1% each day he was late." (*Id.* ¶ 32.)

In or around March of 2023, law enforcement agents learned about three additional individuals that had reportedly been instructed to send funds to the Jiawig Account. First, an individual reported that they were a victim of fraud after being contacted by a woman who offered to help them make large profits through trading Bitcoin on "coindcs-us.co." (*Id.* ¶ 45.) At the instruction of the unknown woman, the individual wired $15,000 to the Jiawig Account. (*Id.*) A second individual reported that they were convinced by an unknown woman to engage in foreign currency exchange rate trading and after the individual tried to withdraw his profits, he was notified that he owed approximately $111,456 and subsequently wired $111,456 to the Jiawig Account. (*Id.* ¶ 47.) A third individual reported that there was a preauthorized charge on her PayPal account that required her verification. (*Id.* ¶ 46.) The individual called the number provided and was told that she needed to wire $40,000 to the Jiawig Account to retrieve her funds. (*Id.*) Her bank successfully stopped the wire transfer. (*Id.*)

In total, law enforcement agents traced $326,456 in victim funds to the Jiawag Account. (*See id.* ¶¶ 31j, 37, 45, 47; *see also* ¶ 48.)

### b. Report and recommendation

Judge Kuo recommended that the Defendant Funds be "found to be subject to forfeiture to the United States, pursuant to" section 981(a)(1)(A) and section 981(a)(1)(C). (R&R 9.) Judge Kuo found that the Government complied with the relevant procedural requirements for default judgment and civil asset forfeiture. (*Id.* at 8–9.) Judge Kuo also concluded that the Government met the substantive requirement of Rule G(2)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which requires that the complaint "state sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of

5

proof at trial." (*Id.* at 5.) Judge Kuo noted that the Government met this standard "by describing a fraudulent scheme in which unknown individuals, pretending to offer investment opportunities in cryptocurrency and/or gold, induced victims to wire funds to various fraudulent investment platforms and websites," (*id.* at 7–8), and "[w]hen victims attempted to withdraw their funds, they were unable to do so," (*id.* at 8). Judge Kuo further noted that the Government has traced victims' funds to the Jiawig Account, which "has also been reported to law enforcement as an account used in other fraudulent schemes." (*Id.* (quoting Am. Compl. ¶ 37).)

Judge Kuo also indicated that the Government "bears the burden of demonstrating that, 'by a preponderance of the evidence, the Defendant Funds are subject to forfeiture,' and because the Government alleges that the Defendant Funds constitute 'property . . . which constitutes or is derived from proceeds traceable' to the [wire fraud and money laundering claims], it must also "establish that there was a substantial connection between the property and the [offenses]." (*Id.* (quoting 19 U.S.C. §§ 983(c)(1) and (3)). Judge Kuo found that "the Government has established that there is a 'substantial connection' between the Defendant Funds and offenses of wire fraud and money laundering" and "has demonstrated by a preponderance of the evidence that the Defendant Funds are subject to forfeiture." (*Id.* at 8–9.) Judge Kuo noted that the Government alleged the elements of wire fraud as the "Amended Complaint describes a scheme of investment fraud in which victims were fraudulently led to believe that they were investing in cryptocurrency or gold," that "the object of the [s]cheme was to induce victims to send money — typically via wire transfer — which the perpetrators of the [s]cheme could thereafter unlawfully retain," and that the "victims' funds were traced to the Defendant Funds." (*Id.* at 8–9.) As to money laundering, Judge Kuo indicated the Government alleges that "[v]ictims of the [s]cheme were directed to wire funds to various bank accounts, including the Jiawig Account" and that "the perpetrators of the [s]cheme established shell business entities and utilized false identities" with "the purpose of concealing and

6

disguising both the nature of the [s]cheme and the individuals behind it, as well as the ownership and control of the [s]cheme's proceeds." (*Id.* at 9.)

## II. Discussion

### a. Standard of review

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "Where parties receive clear notice of the consequences, failure to timely object to a magistrate[] [judge's] report and recommendation operates as a waiver of further judicial review of the magistrate[] [judge's] decision." *Smith v. Campbell*, 782 F.3d 93, 102 (2d Cir. 2015) (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002)); *see also Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022) ("[T]his court has 'adopted the rule that when a party fails to object timely to a magistrate[] [judge's] recommended decision, it waives any right to further judicial review of that decision.'" (internal quotation marks omitted) (quoting *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988))); *Phillips v. Long Island R.R. Co.*, 832 F. App'x 99, 100 (2d Cir. 2021) (observing the same rule (quoting *Mario*, 313 F.3d at 766)); *Almonte v. Suffolk County*, 531 F. App'x 107, 109 (2d Cir. 2013) ("As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." (quoting *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003))); *Sepe v. N.Y. State Ins. Fund*, 466 F. App'x 49, 50 (2d Cir. 2012) ("Failure to object to a magistrate judge's report and recommendation within the prescribed time limit 'may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object.'" (first quoting *United States v. Male Juv.*, 121 F.3d 34, 38 (2d Cir. 1997); and then citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985))); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd &*

7

*Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010) ("[A] party waives appellate review of a decision in a magistrate judge's [r]eport and [r]ecommendation if the party fails to file timely objections designating the particular issue." (first citing *Cephas*, 328 F.3d at 107; and then citing *Mario*, 313 F.3d at 766)).

    **b.    The Court adopts the R&R**

The Court has reviewed the R&R and adopts Judge Kuo's recommendations that the entire amount of the Defendant Funds can be forfeited under section 981(a)(1)(A) as property involved in, or traceable to property involved in, money laundering. However, as explained below, the Court finds that the Government's allegations support that only $326,456 of the $541,953 seized from the Jiawig Account constitutes proceeds from the Investment Fraud Scheme alleged in the Amended Complaint and are therefore forfeitable under section 981(a)(1)(C) as property constituting or derived from proceeds traceable to wire fraud.

    **i.    Forfeiture of the Defendant Funds as wire fraud proceeds pursuant to section 981(a)(1)(C)**

Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" an enumerated violation, or conspiracy to commit such offense. 18 U.S.C. § 981(a)(1)(C). The enumerated violations include wire fraud under 18 U.S.C. § 1343. *See United States v. Muraca*, 803 F. App'x 545, 547 (2d Cir. 2020) (explaining that section 981(a)(1)(C) "provides that '[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of' certain predicate offenses, including wire fraud, is 'subject to forfeiture'" (quoting 18 U.S.C. § 981(a)(1)(C))); *United States v. Brend*, No. 22-CR-00551, 2025 WL 369838, at *1 (S.D.N.Y. Feb. 3, 2025) ("Under 18 U.S.C. § 981, '[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' . . . ,

8

or a conspiracy to commit such offense, 'including wire fraud, is subject to forfeiture.'" (first quoting 18 U.S.C. § 981(a)(1)(C); and then citing 18 U.S.C. §§ 1956(7)(A), 1961(1))). Proceeds of "unlawful activities" encompasses "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A); *United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017) (quoting same); *United States v. Kenner*, 443 F. Supp. 3d 354, 363 (E.D.N.Y. 2020) ("Essentially, '[p]roceeds are property that a person would not have but for the criminal offense.'" (alteration in original) (quoting *United States v. Grant*, No. 05-CR-1192, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008))).

"[T]he burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1); *see In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 86 (2d Cir. 2016) ("In civil forfeiture proceedings, the Government bears the burden of showing by a preponderance of the evidence that the property at issue is subject to forfeiture" and "[t]o carry this burden it must show that the property is more likely than not forfeitable." (citing 18 U.S.C. § 983(c))). The Government must allege in the complaint "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Suppl. R. for Admiralty or Maritime Claims & Asset Forfeiture Actions, R. G(2)(f); *United States v. Assorted Jewelry VL: $39,100.00*, No. 23-CV-1435, 2024 WL 3827668, at *4 (N.D.N.Y. Aug. 15, 2024) (quoting same). "[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense," the Government must "establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3); *see In re 650 Fifth Ave.*, 830 F.3d at 95 ("To show that the

9

property was 'involved in' such a transaction, the Government has the burden of proving that "there was a substantial connection between the property and the offense." (quoting 18 U.S.C. § 983(c)(3))).

Judge Kuo correctly found that the Government alleged the elements of wire fraud and that "victims' funds were traced to the Defendant Funds." (R&R 9 (citing Am. Compl. ¶ 48).) The alleged wire fraud offense is the Investment Fraud Scheme, which the Government contends defrauded victims into sending funds "by electronic wire transfer from their bank accounts to various bank accounts controlled by the perpetrators," including the Jiawig Account. (*See* Gov't's Mem. 14; Am. Compl. ¶¶ 27–29, 31–37.) The Government identifies three victims that wired a total of $326,456 into the Jiawig Account as part of the Investment Fraud Scheme, (*see id.* ¶¶ 31j, 37, 45–47; *see also* ¶ 48), but seeks forfeiture of $541,953, which is $215,497 more than the amount the three victims transferred to the Jiawig Account. The Government does not allege facts to substantiate that the amount in excess of the funds traceable to the known victims constitutes proceeds of the Investment Fraud Scheme. *See United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 197 (2d Cir. 2013) (vacating forfeiture judgment because the record "[fell] well short of demonstrating, by a preponderance of the evidence, . . . that *all* of the seized money constituted proceeds from [the underlying offenses]"). *Cf. United States v. Carmona*, 22-CR-551, 2025 WL 315907, at *6 (S.D.N.Y. Jan. 28, 2025) (finding government met its burden of proving that some funds in seized bank accounts not attributable to specific victims were proceeds of the underlying investment scheme because the transactions "reflect[ed] the indicia" of the transactions for the identifiable victims, including that the funds were "by wire transfers or cashiers' checks; they were in rounded dollar amounts consistent with [fraud scheme] investment packages; and/or were sent from individuals with Hispanic names, which is consistent with the profile of the

10

typical . . . victim"). The Government appears to argue that because it has alleged that some of Defendant Funds may be attributed to known victims who transferred money to the fraudulent Jiawig Account, all funds in the account are proceeds of the Investment Fraud Scheme. (Gov't's Mem. 14.) The Court declines to draw this inference because the Amended Complaint indicates that the Jiawig Account received funds from other sources. Specifically, the Government alleges that the Jiawig Account has been linked to other fraud schemes, (Am. Compl. ¶¶ 37, 44), and the allegations concerning the total amount of wire transfers into, and ACH payments out of, the account indicate that the Jiawig Account received deposits through methods other than wire transfer. From the Jiawig Account's inception until the Government seized the Defendant Funds, a total of $3,497,958 was wired into the account and in the same time period, a total of $3,419,900 was paid out of the account. (*Id.* ¶¶ 40–41.) Based on these allegations, the balance of the Jiawig Account at the time the Defendant Funds were seized should have been approximately $78,058, the difference between the total wired into the account and the total paid out of the account. The total amount seized, however, was significantly more, indicating that the Jiawig Account contained funds that were not deposited by wire transfer. Therefore, the Court finds that the Government has shown that only $326,456 of the Defendant Funds are proceeds of the Investment Fraud Scheme. *See United States v. Fifty Thousand Six Hundred Ninety-Nine Dollars & Fifty Cents in U.S. Currency Seized From Bank of Am. Acct. No. XXXXXXXXXXX Held in the Name of Knightsbridge Priv. Partners LLC*, No. 19-CV-5408, 2020 WL 8413547, at *6 (E.D.N.Y. June 16, 2020) (finding that the defendant funds were substantially connected to the sufficiently pleaded offenses of wire and securities fraud because the complaint detailed the source of the funds in each account to be seized and no interested party filed a claim disputing the allegations), *report and recommendation adopted sub nom. United States v. Fifty Thousand Six Hundred Ninety-Nine Dollars and Fifty Cents ($50,699.50)*, 2020 WL 7640021 (E.D.N.Y.

Dec. 22, 2020).

Accordingly, the Government is entitled to forfeiture under section 981(a)(1)(C) of the $326,456 of the Defendant Funds that can be attributed to victims of the Investment Fraud Scheme and therefore constitute proceeds of the alleged wire fraud offense.

### ii. Forfeiture of the Defendant Funds as property involved in money laundering under section 981(a)(1)(A)

The Government seeks forfeiture of the Defendant Funds under section 981(a)(1)(A) on the basis that the Defendant Funds are property traceable to money laundering in violation of section 1956(a)(1)(B)(i) and conspiracy to commit money laundering in violations of section 1956(h).

Section 981(a)(1)(A) provides for the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of this title, or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A); *In re 650 Fifth Ave.*, 830 F.3d at 95 (same). Section 1956 prohibits money laundering. *United States v. Contents of Acct. No. 68108021*, 228 F. Supp. 2d 436, 438–39 (S.D.N.Y. 2002) (explaining that section 1956(a) is "commonly known as the 'money laundering statute'"), *aff'd sub nom. Collazos v. United States*, 368 F.3d 190 (2d Cir. 2004). Section 1956(a)(1)(B)(i) requires that (1) "there be proceeds from a specified unlawful activity, known to be such by the defendant" and (2) "the defendant conduct or attempt to conduct a financial transaction with those proceeds, knowing the transaction is designed to conceal or disguise the nature or source of the funds." *United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002) (citing 18 U.S.C. § 1956(a)(1)(B)(i)); *United States v. Paldiel*, No. 24-CR-329, 2025 WL 524659, at *13 (E.D.N.Y. Feb. 18, 2025) ("To prove a substantive violation of any of th[e] three forms of money laundering (promotion, concealment, and engagement), the government would be required to prove that defendants engaged in a

"transaction[ ] involving proceeds of 'specified unlawful activity.'" (second alteration in original) (quoting *United States v. Thiam*, 934 F.3d 89, 92 (2d Cir. 2019))); *United States v. Two Hundred Seventy-Two Thousand Dollars and No Cents ($272,000)*, No. 16-CV-6564, 2018 WL 948752, at *4 (E.D.N.Y. Feb. 16, 2018) ("[T]he government must allege that the claimant '(1) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, (2) conducted or attempted to conduct a financial transaction (3) which in fact involved the proceeds of that unlawful activity, (4) either (a) with the intent to promote the carrying on of that unlawful activity or (b) with the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.'" (first quoting *United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006); then quoting *In re 650 Fifth Ave. &Related Props.*, 777 F. Supp. 2d 529, 558 (S.D.N.Y. 2011))); *see also United States v. Garcia*, 587 F.3d 509, 517 (2d Cir. 2009) (explaining that "the heart of the very idea of money laundering . . . is that the transaction itself operates in some way to conceal the nature, source or ownership or the like of the funds, and thus to 'launder' the illicit proceeds"). "'Specified unlawful activity' is defined by reference to a list of other criminal statutes," *United States v. Kumar*, No. 23-7620, 2024 WL 5182670, at *1 (2d Cir. Dec. 20, 2024) (quoting 18 U.S.C. § 1956(c)(7)), and includes wire fraud, *see Szur*, 289 F.3d at 213 (stating that "wire fraud is a 'specified unlawful activity'").

"[W]hen the underlying crime is completed, a transaction conducted with the proceeds from that crime may provide the basis for a money laundering conviction" and "funds become proceeds when they are derived from an already completed offense, or a *completed phase* of an ongoing offense." *Szur*, 289 F.3d at 213–14 (first quoting *United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001), *abrogation on other grounds recognized by United States v. Sullivan*, 118 F.4th 170, 219 n.27 (2d Cir. 2024); and then quoting *United States v. Conley,* 37 F.3d 970,

13

980 (3d Cir. 1994)); *Aliev v. Borukhov*, No. 15-CV-6113, 2016 WL 3746562, at *8 (E.D.N.Y. July 8, 2016) ("The underlying 'unlawful activity' alleged to make out a violation of [s]ection 1956 or 1957 must be distinct from the act of money laundering itself." (citing *Szur*, 289 F.3d at 213–14)); *United States v. Portillo*, No. 09-CR-1142, 2014 WL 97322, at *5 (S.D.N.Y. Jan. 8, 2014) ("The act of money laundering takes place when an individual takes those tainted proceeds and attempts to conceal or disguise them during a subsequent financial transaction." (first citing *McCarthy*, 271 F.3d at 395; and then citing *Szur*, 289 F.3d at 213–24)). "The required 'financial transaction' can be a 'transfer' or 'delivery' of cash . . ." *Garcia*, 587 F.3d at 516 n.4; *see* 18 U.S.C. § 1956(c)(3)–(4) (A "'transaction' includes a . . . transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, . . ., or any other payment, transfer, or delivery by, through, or to a financial institution . . . " and "the term 'financial transaction'" includes "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."). Some courts have also found that money laundering occurs when proceeds from specific unlawful activities are commingled with clean funds to conceal a fraud scheme. *See United States v. $465,789.31 Seized From Term Life Ins. Pol'y No. PJ 108 002 588 in Name of Lee at AXA Eq. Life Ins. Co., N.Y., N.Y.*, No. 15-CV-1353, 2018 WL 4568408, at *3 (D. Conn. Sept. 24, 2018) (explaining that "money laundering may occur if criminal funds are commingled with legitimate funds in order to facilitate or conceal a fraud scheme" so long as there is "evidence of an intent to commingle the funds as part of a plan either to promote unlawful activity or to conceal the source, ownership, or control of unlawful funds").

Section 1956(h) states that "[a]ny person who conspires to commit any [money laundering offense] . . . shall be subject to the same penalties as those prescribed for the offense

14

the commission of which was the object of the conspiracy." 18 U.S.C. § 1956. "Conspiring to launder money requires that two or more people agree to violate the federal money laundering statute, and that the defendant 'knowingly engaged in the conspiracy with the specific intent to commit the offenses that [are] the objects of the conspiracy.'" *Garcia*, 587 F.3d at 515 (alteration in original) (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)); *United States v. Whyte*, No. 19-CR-64, 2022 WL 4120779, at *14 (D. Conn. Sept. 9, 2022) (quoting same). However, proof of an overt act in furtherance of the conspiracy is not required. *See United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) ("[Section] 1956(h) does not require proof of an overt act . . . ." (quoting *Whitfield v. United States*, 543 U.S. 209, 219 (2005))); *United States v. Evergreen Int'l*, 206 F. App'x 71, 77 (2d Cir. 2006) (explaining that *Whitfield v. United States* clarified that an overt act is not required to prove a money laundering conspiracy); *Paldiel*, 2025 WL 524659, at *13 (explaining that because the charge is conspiracy to commit money laundering, "the government does not need to prove that the [money laundering] transaction occurred" (citing *Garcia*, 587 F.3d 509 at 515)). In addition, "[c]harges relating to money laundering need not be pled with 'great particularity,' but they must contain 'all essential elements of the offenses.'" *United States v. Walters*, 963 F. Supp. 2d 125, 132–33 (E.D.N.Y. 2013) (quoting *Bernstein v. Misk*, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997)).

The Government's allegations demonstrate that it can prove that the Jiawig Account and its contents, including the Defendant Funds, were used to launder, or in a conspiracy to launder, money with the intent to "disguise the nature, location, source, ownership, or control of the proceeds of the [Investment Fraud Scheme]" and possibly other fraudulent schemes. *Gotti*, 459 F.3d at 334; *see* Suppl. R. for Admiralty or Maritime Claims & Asset Forfeiture Actions, R. G(2)(f) (In forfeiture actions *in rem*, "[t]he complaint must . . . state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.").

15

The account is held in the name of Jiawig Trade, a shell company that does not appear to maintain a legitimate business operation, and victims of the Investment Fraud Scheme communicated with multiple individuals who appeared to use false identities. (*See* Am. Compl. ¶¶ 31, 36, 45–48.) Millions of dollars moved through the Jiawig Account in the short period between its inception on February 23, 2023, and the Government's seizure of the Defendant Funds on August 1, 2023. (*Id.* ¶¶ 4, 31, 37–38, 40–41.) Over sixty percent of the Defendant Funds is attributable to known victims of the Investment Fraud Scheme, (*id.* ¶¶ 31j, 37, 45, 47; *see also id.* ¶ 48), the Jiawig Account has been linked to other fraudulent schemes reported to law enforcement, (*id.* ¶ 37), and there are no facts to indicate that any funds that flowed through the Jiawig Account came from legitimate sources. *See United States v. Prevezon Holdings, Ltd. (Prevezon Holdings, Ltd. II)*, 251 F. Supp. 3d 684, 696 (S.D.N.Y. 2017) (observing that a reasonable juror could conclude from the use of shell companies and fictitious bank accounts for money laundering that the "transactions involved unlawful proceeds and that those transfers by the fronts were designed to conceal the money's illicit origins" (quoting *United States v. Baxter*, 761 F.3d 17, 32 (D.C. Cir. 2014))); *see also United States v. Hwa*, No. 18-CR-538, 2021 WL 11723583, at *37 (E.D.N.Y. Sept. 3, 2021) ("The true winners today are sophisticated criminals who know how to make criminal proceeds look untainted. . . . [T]hey open bank accounts in other people's names and through shell companies, all to disguise the origins of their funds." (alterations in original) (quoting *Luis v. United States*, 578 U.S. 5, 46 (2016) (Kennedy, J., dissenting))). The Government also alleges that twenty-five outgoing ACH payments were made from the Jiawig Account. (Am. Compl. ¶ 41.) Although the Government provides no details on the outgoing transactions other than the total amount transferred, the Court reasonably infers that the outgoing payments were financial transactions that occurred after at least some proceeds from the Investment Fraud Scheme were wired into the account and that the Jiawig Account was

one of many accounts set-up to allow illicit proceeds from victims of fraud schemes to be transferred to perpetrators without revealing any identities and without any indication that the nature or source of the funds was proceeds of unlawful activities. *See United States v. Munshani*, No. 23-6520, 2024 WL 4448708, at *3 (2d Cir. Oct. 9, 2024) (finding evidence that defendant received proceeds of a wire fraud conspiracy into his bank account and then "transferred the tainted fraud proceeds, less his cut, to his brother" was sufficient to establish participation in a money laundering conspiracy separate from the wire fraud conspiracy because defendant "(1) acquire[d] the proceeds of a specified unlawful activity, and then (2) engage[d] in a financial transaction with those proceeds" (alterations in original) (quoting *United States v. Napoli*, 54 F.3d 63, 67 (2d Cir. 1995), *abrogated on other grounds by United States v. Genao*, 343 F.3d 578, 584 (2d Cir. 2003))), *cert. denied,* 2025 WL 581786 (U.S. Feb. 24, 2025).

The Amended Complaint demonstrates a substantial connection between the Defendant Funds and the money laundering offense because, as mentioned above, there are no facts supporting that any legitimate funds flowed into the Jiawig Account and the account appears to have been set-up to conceal or disguise the funneling of proceeds of the Investment Fraud Scheme and other fraudulent schemes from victims to perpetrators. *See* 18 U.S.C. § 983(c)(3) (requiring the Government to "establish that there was a substantial connection between the property and the offense"); *United States v. Two Hundred Seventy-Two Thousand Dollars & No Cents ($272,000)*, No. 16-CV-6564, 2018 WL 948752, at *4 (E.D.N.Y. Feb. 16, 2018) (explaining that to show a substantial connection "the property either must be used or intended to be used to commit a crime, or must facilitate the commission of a crime" and "[a]t minimum, the property must have more than an incidental or fortuitous connection to criminal activity" (quoting *United States v. One Red 2003 Hummer H2 VIN: 5GRGN23U93H118675*, 234 F. Supp. 3d 415, 421 (W.D.N.Y. 2017))).

Accordingly, the Court finds that the entirety of the Defendant Funds, inclusive of the $215,497 not traced to known victims of the Investment Fraud Scheme, is forfeitable under section 981(a)(1)(A) as property involved in, or traceable to property involved in, money laundering.

### III. Conclusion

Accordingly, the Court grants the Government's motion for default judgment and orders that the Defendant Funds are forfeited and condemned to the use and benefit of the Government pursuant to 18 U.S.C. § 981(a)(1)(A), and that the USSS and its respective agents or contractors shall dispose of the Defendant Funds in accordance with all applicable laws and regulations.

Dated: March 27, 2025
   Brooklyn, New York

SO ORDERED:

 /s/MKB
MARGO K. BRODIE
United States District Judge